[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11036

_____

D.C. Docket No. 0:10-cv-61340-PCH

CARLINE MERISIER,

Plaintiff - Appellant,

versus

BANK OF AMERICA, N.A.,
a national association,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 31, 2012)

Before TJOFLAT, PRYOR and RIPPLE,* Circuit Judges.

_____

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit,
sitting by designation.

TJOFLAT, Circuit Judge:

This is a case under the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq. A bank customer sued her bank to recover for unauthorized withdrawals from her checking account, made using her check card and personal identification number ("PIN"). EFTA requires a bank to investigate such disputed transactions, to notify the customer if it has verified the transactions as authorized, and to recredit the account if the withdrawals were unauthorized; failure to do so renders the bank liable to the customer for up to treble damages.[1] The bank investigated the withdrawals at issue in this case, found that they were the product of a scheme to defraud the bank, and denied liability for the withdrawals.

The customer, represented by counsel, brought suit. By the time the case was tried to the United States District Court for the Southern District of Florida, the customer was pro se. After a two-day bench trial, the District Court rejected the customer's EFTA claims and entered judgment for the bank. Specifically, the District Court found that the transactions were authorized because they were part of a scheme to defraud the bank. The customer appealed pro se. Although the briefs are inartfully drawn, she appears to challenge the District Court's finding as clearly erroneous. After thorough review, we find no error and therefore affirm.

---

[1] These provisions are discussed further in part II.A, infra.

I.

In 2009, Carline Merisier was a new Bank of America checking-account customer. So were Erna Guerrier, Rivelino Richard, and Vandamme Jeanty. These were individuals of Haitian descent, living in South Florida, who had all attended North Miami High School together. They opened their accounts within six months of one another; Jeanty sourced some of the funds, others were untraceable cash deposits. At one time or another, Merisier and Guerrier were dating Jeanty; Jeanty was the only person Merisier had dated since divorcing her husband, Dexter Oliver. When Oliver confronted Merisier about that relationship, she said the man she was seeing was a con artist who was stealing money. Merisier knew that Jeanty was also dating Guerrier. At one point, Jeanty had studied law at the University of Miami. In 2007, however, Jeanty, a noncitizen, was ordered removed in absentia after failing to appear for an immigration hearing; this court upheld that removal order in 2008. Jeanty was arrested near a bank in April 2010 in Naples, Florida, for loitering and for obstructing an officer; in his possession was a clone of Merisier's check card. He has been wanted by the Collier County Sheriff's Department since November 2010.

On March 5, 2010, Merisier went to a South Florida gas station where she attempted to use her Bank of America–issued check card. It was rejected because

3

of a fraud block.  Bank personnel instructed Merisier to complete a fraud affidavit, which she submitted on March 5; she flagged transactions totaling $15,775.76 as unauthorized withdrawals from her account.[2]

By submitting this fraud affidavit to Bank of America, Merisier triggered an investigation into the disputed transactions.  Bank of America investigated

---

[2]  The transactions were described as follows:

| Transaction Date | Amount | Description |
|---|---|---|
| 03/03/10 | $300.00 | BofA ATM |
| 03/03/10 | $600.00 | BofA ATM |
| 03/03/10 | $600.00 | BofA ATM |
| 03/03/10 | $1001.78 | Publix Super Market |
| 03/03/10 | $1503.57 | Publix Super Market |
| 03/03/10 | $1504.38 | Publix Super Market |
| 03/02/10 | $300.00 | BofA ATM |
| 03/02/10 | $600.00 | BofA ATM |
| 03/02/10 | $600.00 | BofA ATM |
| 03/01/10 | $300.00 | BofA ATM |
| 03/01/10 | $600.00 | BofA ATM |
| 03/01/10 | $600.00 | BofA ATM |
| 02/27/10 | $500.00 | BofA ATM |
| 02/27/10 | $500.00 | BofA ATM |
| 02/27/10 | $500.00 | BofA ATM |
| 02/26/10 | $300.00 | BofA ATM |
| 02/26/10 | $600.00 | BofA ATM |
| 02/26/10 | $600.00 | BofA ATM |
| 02/25/10 | $66.03 | 0224 Sunshine [Gas Station] 109 |
| 02/25/10 | $300.00 | [BofA ATM] |
| 02/25/10 | $600.00 | [BofA ATM] |
| 02/25/10 | $600.00 | [BofA ATM] |
| 02/24/10 | $300.00 | [BofA ATM] |
| 02/24/10 | $600.00 | [BofA ATM] |
| 02/24/10 | $600.00 | [BofA ATM] |
| 02/24/10 | $600.00 | [BofA ATM] |

4

Merisier's claim and denied it, in part because it had verified the earliest of the withdrawals as legitimate. On February 24, 2010—the date of the first allegedly unauthorized transaction—an attempt to withdraw $600.00 at an ATM triggered a fraud alert; the card was restricted pending verification. Someone claiming to be the cardholder called in and answered three security queries correctly: the date and dollar amount of a recent deposit, the email address associated with the account, and the government-issued ID number associated with the account. The caller also raised the ATM withdrawal limit from $350.00 to $1500.00. Someone then attempted several cash withdrawals from the same ATM and was successful each time.

On reviewing Merisier's claims, Bank of America determined that this activity indicated that the transactions were in fact authorized. Merisier had affirmed that she never lost possession of her card. Thus, the fact that transactions had been made using her card indicated that the card had been counterfeited or "skimmed." The disputed transactions, however, had all been PIN-based transactions, meaning that whoever had counterfeited Merisier's card also knew her PIN. A third party could have intercepted Merisier's PIN as she attempted to use it at an ATM—but in that event, the scammer would not have known the answers to the bank's security questions. By process of elimination, then,

5

Merisier's was a "sold account"—she had exchanged account access for money.

The source and timing of deposits to Merisier's account was also suspicious: each withdrawal immediately followed a large and out-of-the-ordinary cash deposit.  Merisier's account balance typically averaged a few hundred dollars.  Then, between February 16 and March 3, 2010, Merisier made eight cash deposits totaling $36,700.00.[3]  These facts indicated that whoever made the deposits was inflating the account balance while avoiding federal cash-deposit reporting requirements.[4]  Although each disputed withdrawal shortly followed a deposit, there were no balance inquiries on Merisier's account.  Bank of America concluded that Merisier had colluded with whoever had drawn down her account and had authorized the withdrawals.

On September 8, 2010, Merisier filed the instant action against Bank of

---

[3]  The deposits were as follows:

| Deposit | Date Posted | Amount ($) |
| --- | --- | --- |
| Counter Credit | 02/16/10 | 3300.00 |
| Counter Credit | 02/22/10 | 6300.00 |
| Counter Credit | 02/24/10 | 5000.00 |
| Counter Credit | 02/26/10 | 1000.00 |
| Counter Credit | 03/01/10 | 9000.00 |
| Counter Credit | 03/01/10 | 1100.00 |
| Counter Credit | 03/02/10 | 5000.00 |
| Counter Credit | 03/03/10 | 6000.00 |

[4]  Generally, banks must report cash transactions in excess of $10,000.00.  See 31 U.S.C. § 5331(a).  It is a federal crime to structure cash deposits in such a way that the deposits do not trigger federal reporting requirements.  Id. § 5324(b).

America.  Merisier contended that Bank of America failed to conduct a reasonable investigation of her claim, failed to follow EFTA's claim-resolution procedures, and unlawfully held her liable for unauthorized transactions.  Accordingly, Merisier claimed that she was entitled to recover actual damages—the $15,775.76 withdrawn from her account—trebled for willful EFTA violation.  Bank of America denied liability and claimed that Merisier schemed with Jeanty, Richard, and Guerrier to defraud the bank.

The case was tried on March 1, 2011; the following evidence was presented.  First, Bank of America employee Todd Holt, the claims investigator assigned to Merisier's case, reviewed Merisier's unauthorized-transaction claim.  Holt recommended denial based on (1) security verification following the fraud block, (2) the security of Merisier's debit card and PIN, (3) the exclusively PIN-based transactions, and (4) the structured deposits into the account before the withdrawals were made.  Particularly, the claim was suspicious because seemingly structured deposits accompanied the withdrawals claimed to be fraudulent.[5]

Second, Robin Nicorvo, a senior investigator for Bank of America,

---

[5]  At the time he denied Merisier's claim, Holt had also become aware that Richard had filed an unauthorized-transactions claim.  He was impressed by similarities between the Richard and Merisier claims, including inflated balances before withdrawals, multiple withdrawals, and the raising of withdrawal limits.  Holt also discovered that Richard knew Jeanty.

7

investigated the claims made by Richard, Guerrier, and Jeanty. Her investigation revealed that Richard and Guerrier reported unauthorized debits on their respective cards and that their accounts had low balances that spiked before allegedly unauthorized activity. Among the documents she reviewed were letters on behalf of Guerrier and Richard, respectively, that Bank of America had received from a purported law firm. No such law firm or attorney existed, however—the address and telephone number provided were Jeanty's.

Third, Merisier testified that she opened her Bank of America account in 2008 to receive child support payments from ex-husband Dexter Oliver. Then, just before the transactions she reported as unauthorized, she deposited approximately $36,000.00 in cash. Merisier claimed that the deposits represented profits from her real estate company: she purportedly received commission checks at closings, cashed them at check cashing stores, and then deposited the cash.

Merisier claimed she did not know who had compromised her account when she filed her claim. Admittedly, by the time of her deposition she had realized that her account had been compromised by an ex-boyfriend and acknowledged dating Jeanty. Moreover, Merisier's telephone records indicated that in the months

8

leading up to her filing suit she had called Jeanty's number 76 times.[6]  It was undisputed that Jeanty used Merisier's card or a clone thereof and that Jeanty did know Merisier's PIN.  Nevertheless, Merisier maintained that she never authorized Jeanty to use her card, never gave him her card, never gave him her PIN, and never wrote down her PIN anywhere.  Merisier denied having given Jeanty any personal information, including the answers to Bank of America's security questions.

Fourth, Bank of America's expert, a white-collar crime investigator, opined that Jeanty directed an organized scheme to defraud Bank of America and that Merisier and two other individuals were willing participants in this scheme.  Although unable to testify at trial, his report, which was admitted into evidence, laid out the scheme in which Merisier had acted with Jeanty to defraud the bank.

At the conclusion of the trial, in an oral ruling, the District Court explained that its findings were based on the live witnesses' testimony; on the deposition testimony of Guerrier, Richard, and Oliver; on exhibits submitted by the parties; and on the bank expert's report.  Regarding the reasonableness of the investigation Bank of America performed, the District Court reasoned,

---

[6]  Similarly, Merisier denied knowing Guerrier, even though her phone records showed that she called Guerrier on several occasions around the time she filed her claim.  She also denied knowing Richard—even when presented with a warranty deed she and Richard had both signed. She explained the similarity of her complaint to those filed by Guerrier and Richard by admitting that she had access to Guerrier's and Richard's Bank of America files and complaints.

9

I think any reasonable person would have concluded that there was fraud here. . . . [T]he claims were not by mistake but they were authorized either directly or indirectly by [Merisier] . . . . So, I am going to deny the [unreasonable-investigation] claim.

Merisier v. Bank of America, 10-61340-CV-PCH, Tr. at 12–13 (S.D. Fla. Mar. 2, 2011). The court therefore rejected Merisier's treble-damages EFTA claim.

The District Court then made the following findings:

[Merisier] had a balance that was historically low and . . . a few days prior to the subject transactions . . . [she] deposited approximately $36,000 in cash . . . .

[T]his is a pattern that is consistent with a fraudulent claim against the bank for a couple of reasons.

One, the funds were . . . made in cash under circumstances that while they were explained by the plaintiff I find to be not credible.

Second, they were patterns such as they seemed to be structured, that is to be cash deposits of less than $10,000. . . .

. . . .

[O]n February 28th, 2010 . . . an attempt was made by someone to withdraw $600 from the bank account. . . .

[B]ecause of indications or badges of fraud the bank . . . put a block on the plaintiff's account . . . . Later that day after that . . . attempt to withdraw $600 was denied, within minutes . . . someone called the bank, and answered three security questions . . . .

. . . .

10

Apparently that was accepted by the bank and the next attempt to withdraw $600 was approved.  Subsequently on March the fifth plaintiff submitted . . . a fraud affidavit, which gives rise to [this suit].  Also . . . someone . . . increased not only the amount of money that was available to be withdrawn but [also] . . . increased the withdrawal limit.

That was done suspiciously, I might add, just before these subject withdrawals were made.  And the obvious purpose of this was so that larger withdrawals could be made from the account. . . .

. . . .

[E]ither deliberately or inadvertently Ms. Merisier . . . provided this information to Mr. Jeanty such that he or someone at his behest made those withdrawals.

I find the plaintiff is responsible for those, or at least she has not proven by the greater weight of the evidence that these transfers were unauthorized transfers.

I find the evidence suggests that they were in fact authorized transfers.  The plaintiff was either a knowing participant or was duped by Mr. Jeanty . . . .  [S]he provided him with the information that allowed those withdrawals to be made.  And I find they were not the result of a mistake but they were, in fact, authorized . . . .

. . . .

I find that there's been compliance by the bank with its obligations under the EFTA.  I find that based on the numerous badges or indicia of fraud . . . that the bank concluded in good faith that they were fraudulent transfers.

I find that the plaintiff has not proven her case by the greater weight of the evidence and I am ruling in favor of defendant.

11

Id. at 24–27.  Thus, the District Court found that Bank of America was not liable for the amount withdrawn from Merisier's account.

On appeal, Merisier contends that the District Court erred in finding that Bank of America did not violate any provision of EFTA.  In this respect, Merisier argues that the District Court applied the wrong burden of proof to her at trial, contending that, under EFTA, Bank of America bore the burden to demonstrate the transfers were authorized.  Essentially, she maintains that the District Court's finding that the subject transactions were authorized was clearly erroneous.  She contends the District Court mistakenly considered the following factors because they were mischaracterized by the trial judge or irrelevant: (a) evidence of a scheme to defraud; (b) ostensible evasion of cash-deposit reporting requirements; and (c) the source of the deposits to Merisier's account.[7]

---

[7]  Merisier also argues that the District Court erred by failing to find an EFTA violation based on a request for documents used in the bank's investigation.  We reject this argument out of hand.  She contends that Bank of America violated EFTA when, "upon request of the consumer," it failed to "promptly deliver . . . all documents which the financial institution relied on to conclude that such error did not occur."  15 U.S.C. § 1693f(d).  Merisier testified that she requested in writing the documents upon which Bank of America found no error on her account.  At trial, she produced no evidence of such a request and admitted that she did not keep a copy of her letter requesting the documents.  Apparently, that letter was included with her complaint, but was never produced at trial or admitted into evidence.  The District Court found that Merisier did not request the documents.  Inasmuch as the District Court based its finding on the evidence adduced at trial, the District Court did not err in concluding that Merisier had not requested the documents.  We give due regard to the District Court's credibility determination in impliedly rejecting Merisier's trial testimony.  See In re Chalik, 748 F.2d 616, 619 (11th Cir. 1984) ("[T]he trial judge is best able to assess the credibility of the witnesses before him and thus the evidentiary content of their testimony.").  And the District Court did not err in refusing to

12

II.

Merisier believes that Bank of America did not do what EFTA required it to do with respect to transactions she claimed were in error because they were unauthorized. EFTA, in turn, requires banks to follow one of two paths in response to such an alleged error on an account: (1) to investigate and correct the error if an unauthorized transfer has occurred, or (2) to investigate and inform the customer that no error occurred if the transfer was authorized by the customer. The bank followed the steps of path (2) after it determined that Merisier had in fact authorized the transactions at issue. Merisier thinks the bank ought to have followed path (1) because she insists to this day that the disputed transactions were unauthorized. She thinks the District Court improperly forced her to prove the bank ought to have followed path (1) and found for the bank when she did not.

The District Court's fact findings, however, foreclose Merisier's position. The District Court found that the bank complied with EFTA because the disputed transactions were authorized—they were an attempt to defraud the bank. Merisier has advanced no reason why the District Court's findings were clearly erroneous. We therefore have no occasion to disturb the District Court's conclusion that Bank of America did not violate EFTA.

consider matters not in evidence.

13

A.

Various EFTA provisions govern the transactions at issue.  EFTA applies to "any transfer of funds . . . which is initiated through an electronic terminal . . . so as to . . . authorize a financial institution to debit or credit an account," such as ATM and PIN-based point-of-sale cash withdrawals.  15 U.S.C. § 1693a(7). When a customer believes that an ATM withdrawal was unauthorized and thus in error, and notifies her bank, the bank has a duty to "investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days."  Id. § 1693f(a).  The bank must correct any detected error within one business day after such determination.  Id. § 1693f(b)–(c).[8]  A bank that does not so comply may be liable to the customer for damages.[9]

---

[8]  Correction is subject to the consumer's limited liability for "unauthorized transfers" under § 1693g.  15 U.S.C. § 1693f(b).  Section 1693g provides as follows:

> A consumer shall be liable for any unauthorized electronic fund transfer . . . only if the card . . . utilized for such transfer was an accepted card . . . and if the issuer of such card . . . has provided a means whereby the user of such card . . . can be identified as the person authorized to use it . . . .

Id. § 1693g(a).  If these conditions are met, EFTA limits customer liability to the lesser of $50 or the amount withdrawn before the customer alerted the bank to unauthorized transactions.  Id. § 1693g(a)(1)–(2).

[9]  A bank that violates EFTA "is liable to such consumer in an amount equal to the sum of any actual damage sustained by such consumer as a result of such failure [and,] in the case of an individual action, an amount not less than $100 nor greater than $1,000."  15 U.S.C.

14

A withdrawal does not become an "error" simply because a customer later disputes it—particularly when the error was manufactured as part of a fraudulent scheme. EFTA defines an "error," for purposes relevant to this case, as "an unauthorized electronic fund transfer." Id. § 1693f(f)(1). An unauthorized electronic fund transfer is an electronic transfer initiated by a third party without actual authority to do so and from which the customer derives no benefit. Id. § 1693a(12). EFTA, however, excludes two pertinent classes of transactions from this definition: those (A) "initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer," unless the customer alerts her bank that the transferor is no longer authorized to make transfers; and those (B) "initiated with fraudulent intent by the consumer or any person acting in concert with the consumer." Id. "In any action which involves a consumer's liability for an unauthorized electronic

_____

§ 1693m(a)(1)–(2)(A). If a court finds that

> (1) the financial institution did not provisionally recredit a consumer's account within . . . [ten days] and the financial institution
>> (A) did not make a good faith investigation of the alleged error, or
>> (B) did not have a reasonable basis for believing that the consumer's account was not in error; or
> (2) the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn . . . ,

then the court may award treble damages. Id. § 1693f(e).

15

fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized." Id. § 1693g(b).

### B.

It is irrelevant whether the District Court improperly placed on Merisier the burden to prove that the transactions were unauthorized. Although EFTA may place the burden on banks to show that claims are unauthorized before denying claims, see id., Merisier's transactions were authorized as a matter of fact. The District Court did not find for Bank of America because Merisier had failed to prove that the transactions were unauthorized. Rather, the District Court, as the trier of fact, merely determined that the greater weight of the evidence showed that the transactions were authorized. In short, because the District Court found that the withdrawals were authorized as part of a fraudulent scheme, Bank of America effectively carried its burden under § 1693g(b) to show that the withdrawals at issue were authorized.

Based on the District Court's finding, Bank of America was not liable for the withdrawals for at least one of two reasons. Merisier furnished the means of access to her account voluntarily, either as a willing participant in a fraudulent scheme or as one duped by Jeanty; Merisier admitted the information could not have fallen into Jeanty's hands by mistake or accident. First, therefore, Merisier

16

furnished Jeanty with access to her account without notifying Bank of America that she did not intend him to withdraw funds.  See id. § 1693a(12)(A).  Alternatively, Merisier collaborated with Jeanty, which would have brought the disputed transactions squarely under § 1693a(12)(B), which excludes transfers "initiated with fraudulent intent by the consumer or any person acting in concert with the consumer."  Either way, EFTA's error-correction protocols did not apply to these transactions.[10]

On appeal, Merisier has advanced no reason to disturb the District Court's findings.  That the transactions were authorized is a factual determination that we will reverse only for clear error.  See Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1230 (11th Cir. 2009).  "A finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Newmann v. United States, 938 F.2d 1258, 1262 (11th Cir. 1991) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985)).  Merisier has failed to make such a showing; her arguments

---

[10]  Rather, Bank of America promptly complied with the EFTA provisions that did apply to Merisier's claims.  Bank of America "investigate[d] the alleged error, determine[d] whether an error ha[d] occurred, and . . . mail[ed] the results of such investigation and determination to [Merisier] within ten business days."  15 U.S.C. § 1693f(a).  The bank also "deliver[ed] . . . to [Merisier] an explanation of its findings within 3 business days after the conclusion of its investigation."  Id. § 1693f(d).

17

focus on her perception that the District Court erroneously required her to prove

that the withdrawals were unauthorized.  It is thus undisputed that substantial

evidence supports the District Court's finding that the transactions were

authorized.  See id.  We are thus left with no "definite and firm conviction that a

mistake has been committed."  Id.  The District Court therefore did not err in

finding that the transactions were authorized and, consequently, that Bank of

America had not violated EFTA.[11]

### III.

For the foregoing reasons, we conclude that the District Court did not err by

denying Merisier's EFTA claims against Bank of America.  Accordingly, the

judgment of the District Court is

---

[11]  We reject Merisier's argument that District Court premised its factual conclusions on irrelevant information.  According to Merisier, the District Court ought not to have considered evidence suggesting a scheme to defraud, evidence suggesting the skirting of cash-deposit reporting requirements, or evidence raising suspicions about the source of the funds in Merisier's account.  These facts are all relevant because they suggest the withdrawals were authorized.  See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").  Thus, Merisier has failed to show error on the District Court's part for considering such evidence.  See United States v. Vincent, 648 F.2d 1046, 1051 (5th Cir. 1981) ("The trial judge has broad discretion as to relevance and materiality of evidence, and his rulings regarding such will not be disturbed on appeal absent a clear showing of an abuse of discretion.").

We also reject Merisier's argument that, essentially, the District Court's findings were erroneously colored by Bank of America's investigation, which Merisier believes was unsatisfactory.  The District Court's findings, however, were based on an allegedly insufficient investigation.  If this investigation was too cursory, further development of this case has yielded only additional evidence of fraud.

18

AFFIRMED.[12]

---

[12] Merisier's remaining arguments are without merit and warrant no discussion.