RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MICHIGAN FIRST CREDIT UNION,

*Plaintiff-Appellant*,

*v.*

T-MOBILE USA, INC.,

*Defendant-Appellee*.

No. 23-1952

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-13159—Jonathan J.C. Grey, District Judge.

Decided and Filed:  July 16, 2024

Before:  MOORE, COLE, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Charles J. Holzman, HOLZMAN LAW, PLLC, Southfield, Michigan, for Appellant.  Robert D. Boley, ARENT FOX SCHIFF LLP, Ann Arbor, Michigan, Jennifer K. Chung, DAVIS WRIGHT TREMAINE LLP, Seattle, Washington, James H. Moon, DAVIS WRIGHT TREMAINE LLP, Los Angeles, California, for Appellee.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge.  The Electronic Fund Transfer Act ("EFTA") requires banks, credit unions, and similar financial institutions to reimburse their customers for unauthorized electronic transfers of money from the customers' accounts.  Pursuant to its obligations under the EFTA, Michigan First Credit Union had to reimburse several of its customers for unauthorized electronic fund transfers who were subject to a cellphone scheme.  Michigan First now seeks to recover those reimbursed funds from wireless cellular service provider T-Mobile USA, Inc.

Specifically, Michigan First contends it is entitled to indemnification or contribution from T-Mobile.  The district court dismissed Michigan First's complaint, finding it failed to state a claim for indemnification or contribution under the EFTA or state law.  We affirm.

## I.

T-Mobile is a wireless telephone carrier with millions of subscribers.  Each subscriber's mobile device is given a subscriber identity module ("SIM") card with a unique T-Mobile identifier.  The SIM card ensures that calls, text messages, and other data are properly routed to the subscriber's device.

A scam called "SIM Swap" has victimized some T-Mobile subscribers.  A SIM Swap occurs when: (1) a scammer contacts T-Mobile and falsely claims that a subscriber's mobile device was lost, damaged or stolen; (2) the scammer asks T-Mobile to activate a new SIM card associated with the subscriber's device—when the card is actually located in the scammer's device; (3) T-Mobile does not properly validate the request and unwittingly activates the new SIM card, thereby giving the scammer access to the subscriber's data; (4) the scammer takes advantage of this by accessing the subscriber's private information, including bank details; and (5) the scammer uses these details to make unauthorized financial transactions.  After discovering the scam, T-Mobile subscribers often contact their banks to challenge the unauthorized charges.  Financial institutions subject to the EFTA must reimburse their customers for unauthorized transactions regardless of fault, except in limited circumstances.  15 U.S.C. § 1693g; *see also Merisier v. Bank of Am., N.A.*, 688 F.3d 1203, 1204 (11th Cir. 2012).

Michigan First is a state-chartered credit union subject to the EFTA.  Michigan First claims that T-Mobile failed to adequately safeguard its subscribers from SIM Swaps and, as a result, Michigan First has been forced to reimburse its affected customers.

Michigan First filed a putative class action against T-Mobile, seeking to hold T-Mobile liable for these reimbursed funds based on common-law indemnification and contribution. Michigan First's amended complaint raised claims for indemnification and contribution under the EFTA and its implementing regulation ("Regulation E"), 12 C.F.R. pt. 1005, the Michigan

Electronic Funds Transfer Act ("MEFTA"), Mich. Comp. Laws § 488.1–.31, and state common law.

T-Mobile moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6), arguing: (1) the EFTA does not provide for indemnification or contribution; (2) the EFTA expressly preempts the MEFTA, and (3) the EFTA also preempts any state common-law claim for indemnification or contribution. The district court agreed and dismissed Michigan First's amended complaint. This timely appeal followed.

## II.

We review an order dismissing a complaint under Federal Rule of Civil Procedure 12(b)(6) de novo. *Lindke v. Tomlinson*, 31 F.4th 487, 495 (6th Cir. 2022). To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Determining whether a complaint states a facially plausible claim requires courts to construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and decide whether there is enough factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.

On appeal, Michigan First offers three theories to show that it has stated viable indemnification and contribution claims. First, it contends that the EFTA implies a right to indemnification or contribution. Second, Michigan First asserts that it has stated a claim for indemnification or contribution under the MEFTA because the EFTA does not preempt the MEFTA. And third, Michigan First maintains that the EFTA does not preempt its state common-law indemnification claim. We address each argument in turn.

### A. Indemnification or Contribution under the EFTA

The U.S. Constitution grants Congress the authority to pass federal laws within the purview of its enumerated powers. U.S. Const. art. I, §§ 1, 8. This includes the authority to

create "private rights of action to enforce federal law." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). But when Congress "enacts a provision that creates a right or prohibits specified conduct," it "may not wish to pursue the provision's purpose to the extent of authorizing private suits for damages." *Hernandez v. Mesa*, 589 U.S. 93, 100 (2020). We thus look to federal statutes to determine whether Congress has established a cause of action and to discern the available remedies. *See id.*

Indemnification and contribution are remedies sometimes available to aggrieved litigants. Generally speaking, a right to indemnification can arise where the wrongful act of one party results in another party being held liable, entitling the latter party to restitution for any losses. Restatement (Second) of Torts § 886B (Am. L. Inst. 1979). A right to contribution arises when two or more parties cause a loss, requiring each party to pay a proportionate share of the loss. *Id.* § 886A. Claims for indemnification or contribution under a federal statute may be created in two different ways: (1) through action by Congress, either expressly or implicitly; or (2) by "federal common law through the exercise of judicial power to fashion appropriate remedies for unlawful conduct." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 90 (1981); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638 (1981); *Miller v. Bruenger*, 949 F.3d 986, 991 (6th Cir. 2020). It is undisputed that the EFTA does not contain an express right to indemnification or contribution. *See* 15 U.S.C. § 1693 *et seq.* We therefore focus our attention on whether the EFTA provides an implied remedy and, if not, whether one exists under federal common law.

## 1.

Determining whether the EFTA provides for an implied right to indemnification or contribution requires us to construe the statute. *Nw. Airlines*, 451 U.S. at 91. The "ultimate question" is "whether Congress intended to create the private remedy." *Id.* Four factors relevant to this analysis include: (1) the statutory text—specifically, whether the language indicates that the statute was enacted for the "special benefit of a class of which [the plaintiff] is a member"; (2) the statute's legislative history; (3) the purpose and structure of the statute's scheme; and (4) the likelihood that Congress intended to supersede or supplement existing state remedies. *Id.* at 91–92. "[U]nless this congressional intent can be inferred from the language of the statute, the

statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Id.* at 94.

Start with the statutory text. The EFTA does not mention a right to indemnification or contribution for financial institutions. To the contrary, the plain text demonstrates that Congress enacted the EFTA for the benefit of consumers, not financial institutions like Michigan First.

Congress passed the EFTA as Title XX of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub. L. No. 95-630, 92 Stat. 3641 (codified at 15 U.S.C. § 1693 *et seq.*), which added the EFTA as Title IX to the comprehensive financial regulatory reform package known as the Consumer Credit Protection Act, 15 U.S.C. §§ 1601–1692 (1976). The EFTA, as we have explained, "protects individual consumer rights by 'provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems.'" *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 351 (6th Cir. 2008) (alteration in original) (quoting 15 U.S.C. § 1693(b)). Although the use of the term "participants" might suggest that Congress intended to also benefit financial institutions, Congress clarified that "[t]he primary objective of" the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b). And the legislative findings accompanying the EFTA indicate that Congress adopted the Act to regulate the conduct of financial institutions for the benefit of their consumers:

> Congress finds that the use of electronic systems to transfer funds provides the potential for substantial benefits *to consumers*. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined.

*Id.* § 1693(a) (emphasis added).

Other provisions in the EFTA bolster the conclusion that the purpose of the Act is to benefit consumers, even at the expense of financial institutions. The EFTA requires financial institutions to investigate and resolve consumer-reported unauthorized electronic fund transfers within a limited time frame. *Id.* § 1693f. And although consumers can be liable for unauthorized electronic fund transfers involving their accounts, the EFTA limits their liability and places the burden on financial institutions to prove consumer liability. *Id.* § 1693g(a)–(b).

To that end, "a consumer incurs no liability from an unauthorized electronic fund transfer." *Id.* § 1693g(e). The EFTA does, however, impose liability on financial institutions for failing to make an authorized electronic fund transfer or failing to stop payment on "a preauthorized transfer from a consumer's account when instructed to do so." *Id.* § 1693h(a). The EFTA also mandates lengthy consumer disclosure requirements on financial institutions in several different areas, including preauthorized electronic fund transfers from consumer accounts along with electronic fund transfers initiated from electronic terminals. *See, e.g.*, *id.* §§ 1693c, 1693d, 1693e, 1693o-1.

Most importantly, the EFTA creates a cause of action for consumers, not financial institutions. It allows suits against "any person who fails to comply with any provision" of the Act "with respect to any consumer." *Id.* § 1693m(a). This includes an ability for consumers to seek treble damages in some instances. *Id.* § 1693f(e). "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Tex. Indus.*, 451 U.S. at 639. Based on these provisions, "it cannot possibly be said that [financial institutions] are members of the class for whose especial benefit [the EFTA] was enacted." *See Nw. Airlines*, 451 U.S. at 92.

The EFTA's structure "similarly counsels against recognition of the implied right" to indemnification or contribution that Michigan First "advocates in this case." *See id.* at 93. "The presumption" that a right to indemnification or contribution was "deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Id.* at 97. Here, the EFTA provides a comprehensive framework governing the rights, liabilities, and responsibilities of both consumers and financial institutions.

The EFTA contains detailed provisions governing the investigation and resolution responsibilities of financial institutions if a consumer-reported unauthorized transaction occurs. 15 U.S.C. § 1693g. It also creates a complex administrative scheme that allocates enforcement responsibilities among several different entities, including federal banking agencies, the administrator of the National Credit Union Administration, the Secretary of Transportation, the Securities and Exchange Commission, the Consumer Financial Protection Bureau, and the

Federal Trade Commission. *Id.* § 1693o(a), (c). The EFTA also authorizes civil and criminal penalties for violations. *Id.* §§ 1693m(a), 1693n.

The two remaining factors are legislative history and Congress's intent relative to state remedies. The EFTA's legislative history is silent about whether Congress intended indemnification or contribution rights for financial institutions. And Congress intended the EFTA to supersede inconsistent state remedies while supplementing consistent state remedies. *Id.* § 1693q.

Ultimately, none of the relevant factors weighs in favor of finding an implied right to indemnification or contribution for financial institutions under the EFTA. And it is "not within our competence as federal judges to amend" the EFTA and insert "another private remedy not authorized by Congress." *Nw. Airlines*, 451 U.S. at 94.

We note that this case bears a significant resemblance to *Northwest Airlines*. There, an airline raised claims for an implied right to contribution under the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964 against two labor unions. *Id.* at 79–82. This came after a district court awarded damages to a class of female cabin attendants who claimed the airline committed pay discrimination. *Id.* The Supreme Court refused to imply a right to contribution under either statute because: (1) neither statute "expressly create[d] a right to contribution in favor of employers"; (2) employers were not the intended beneficiaries under either statute; and (3) both statutes contained comprehensive enforcement schemes "designed to eliminate certain varieties of employment discrimination." *Id.* at 91–94. Thus, it was inappropriate to add another cause of action not already enumerated. *Id.*

The same can be said here. The EFTA does not contain an express right to indemnification or contribution. Michigan First is not an intended beneficiary of the EFTA because the Act was clearly meant to benefit consumers, not financial institutions. And the EFTA already provides a comprehensive enforcement scheme that leaves no room for an implied right to indemnification or contribution for financial institutions.

Faced with these headwinds, Michigan First ignores our precedent indicating that the EFTA protects consumers' rights. *See Clemmer*, 539 F.3d at 351. It instead cherry-picks parts of the EFTA to argue that Congress intended to create a right to indemnification or contribution for financial institutions. But Michigan First points to nothing in the EFTA, its structure, or its legislative history indicating that Congress intended to create a right for financial institutions to seek indemnification or contribution from third parties.

We consider next whether the federal common law provides a right to indemnification or contribution to financial institutions under the EFTA.

**2.**

The Supreme Court has told us: "There is no federal general common law." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Nevertheless, the Court has recognized "the need and authority in some limited areas to formulate what has come to be known as 'federal common law.'" *Tex. Indus.*, 451 U.S. at 640 (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 308 (1947)). "These instances are few and restricted, and fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop substantive law." *Id.* (citations and internal quotation marks omitted).

There is no basis in federal common law to provide a right to indemnification or contribution in an EFTA action. Moreover, it would be inappropriate to create such a right because the EFTA is a "comprehensive legislative scheme." *See Nw. Airlines*, 451 U.S. at 97; *see also Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979) ("[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). Thus, we will not create an EFTA indemnification or contribution remedy under federal common law. *See Territory of Guam v. United States*, 593 U.S. 310, 316 (2021) ("[A] federal contribution action is virtually always a creature of a specific statutory regime."). Michigan First does not argue otherwise.

**B.  Indemnification or Contribution under the MEFTA**

Michigan First contends that it can bring claims for indemnification or contribution under Michigan Compiled Laws § 488.14, which is part of the MEFTA.  Because the EFTA preempts this provision of the MEFTA, we disagree.

The EFTA empowers the Consumer Financial Protection Bureau ("CFPB") to preempt state laws that are "inconsistent" with the Act's provisions.  15 U.S.C. § 1693q.  If the CFPB declares a state law inconsistent with the EFTA, financial institutions incur no liability "for a good faith failure to comply" with that state law.  *Id.*  The CFPB's preemption determination is generally "dispositive" unless it is "demonstrably irrational."  *See Clemmer*, 539 F.3d at 353 (quotation omitted).

The CFPB has already determined that the EFTA preempts § 488.14 of the MEFTA.  Unlike the EFTA, the MEFTA imposes liability on customers for unauthorized transactions if the financial institution can show "the customer's negligence substantially contributed to the unauthorized use" of their account.  Mich. Comp. Laws § 488.14(1).  In 1981, the Federal Reserve Board—originally assigned the EFTA's preemption powers—found § 488.14 inconsistent with the EFTA's provisions because "a consumer's liability for unauthorized use [under the EFTA] is not related to the consumer's negligence and depends instead on the consumer's promptness in reporting the loss or theft of the access device."  12 C.F.R. pt. 1005, supp. I, cmt. 12(b)(3)(ii).  After Congress assigned to the CFPB the responsibility of determining "whether a State requirement is inconsistent or affords great protection" than the EFTA, 15 U.S.C. § 1693q, the CFPB adopted the Federal Reserve Board's decision, *see* 12 C.F.R. pt. 1005, supp. I, cmt. 12(b)(2).

Thus, Michigan First "shall incur no liability" for failing to comply with § 488.14.  *See* 15 U.S.C. § 1693q.  That alone defeats Michigan First's claim because, under Michigan law, a plaintiff does not have a right to indemnification or contribution if the plaintiff is not liable for the judgment in the underlying action.  *See In re Air Crash Disaster*, 86 F.3d 498, 548–49 (6th Cir. 1996) (applying Michigan law); *see also Proctor & Schwartz, Inc. v. U.S. Equip. Co.*, 624 F.2d 771, 775 (6th Cir. 1980) ("[A] party is not entitled to indemnity if it was not, in fact, liable for the judgment in the underlying action." (citation omitted)).  Because Michigan First makes no

attempt to show that the CFPB's construction is otherwise "demonstrably irrational," we find that Michigan First has not stated a claim for indemnification or contribution under the MEFTA.

### C. State Common-Law Claim for Indemnification

Michigan First argues that it has stated a common-law claim for indemnification under Michigan law to offset its federal EFTA liability. But the EFTA also preempts this claim.

The concept of federal preemption of state law emanates from the U.S. Constitution's Supremacy Clause. Under the Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI. "Laws of the United States" include federal statutes and their accompanying regulations. *City of New York v. FCC*, 486 U.S. 57, 63 (1988). Thus, federal statutes and regulations will preempt state laws that conflict with, or frustrate the purpose of, federal law. *Id.* at 64. This involves a question of whether the federal statutes and regulations show an "intent to supplant state authority in a particular field." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604–05 (1991).

Federal law can preempt state law expressly or impliedly. *State Farm Bank, FSB v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008). Express preemption occurs when a federal statute or regulation explicitly indicates that it is preempting "a specific type of state law." *Id.* at 341–42. Implied preemption, on the other hand, comes "in one of two forms: field or conflict." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 859 (6th Cir. 2023). "Regardless of the type of preemption at issue, this court's duty is to determine whether state regulation is consistent with the structure and purpose of applicable federal law." *State Farm Bank*, 539 F.3d at 342 (quotation omitted).

The EFTA preempts state law "to the extent that those laws are inconsistent with" it. 15 U.S.C. § 1693q. Regulation E provides that "[s]tate law is inconsistent with" the EFTA "if state law . . . [r]equires or permits a practice or act prohibited by the Federal law." 12 C.F.R. § 1005.12(b)(2)(i). Congress has empowered the CFPB to "determine whether a State requirement is inconsistent" with the EFTA. 15 U.S.C. § 1693q; *accord* 12 C.F.R.

§ 1005.12(b)(1).  But "[a] state law that is inconsistent may be preempted even if the [CFPB] has not issued a determination."  12 C.F.R. pt. 1005, supp. I, cmt. 12(b)(1).

As discussed above, financial institutions do not have a right to indemnification under the EFTA.  So allowing financial institutions to seek indemnification under state law for liability it has incurred under the EFTA is inconsistent with federal law.  The EFTA thus preempts Michigan First's state-law indemnification claim.

Michigan First pushes back on this conclusion.  Relying on *Delay v. Rosenthal Collins Group, LLC*, 585 F.3d 1003 (6th Cir. 2009), Michigan First argues the EFTA does not preempt its state-law indemnification claim.  The *Delay* plaintiff raised state-law indemnification claims against his former employer after he incurred legal fees in successfully defending himself against an action brought under the federal Commodities Exchange Act ("CEA").  *Id.* at 1004–05.  We determined that because the plaintiff defeated the CEA claim brought against him, he was not seeking indemnification for a violation of the CEA but, instead, was seeking reimbursement under an entirely independent state theory.  *See id.* at 1006–07.  Thus, his state-law indemnification claim did not "'tend[] to frustrate and defeat' the CEA's purposes."  *Id.* at 1006 (alteration in original) (quoting *Heizer Corp. v. Ross*, 601 F.2d 330, 334 (7th Cir. 1979)).  We concluded "that Congress did not intend to displace the state-law indemnification rights . . . of parties found *not* to have violated the CEA."  *Id.*

Here, Michigan First seeks indemnification for liability it incurred under the EFTA, not for defeating an EFTA claim.  In its amended complaint, Michigan First acknowledged that it incurred liability under federal law for unauthorized electronic fund transfers.  *Delay* is therefore distinguishable.  The EFTA lays out the rights and liabilities of consumers and financial institutions for unauthorized electronic fund transfers.  Allowing Michigan First to pursue a state-law claim for liability it incurred under federal law would not only frustrate the EFTA's purpose, but it would also contradict the text of the statute and interfere with its existing comprehensive scheme.  *Cf. Donovan v. Robbins*, 752 F.2d 1170, 1179 (7th Cir. 1985) ("Where contribution is sought by one who has had to pay damages for violating a federal statute, the scope and limitations of the right of contribution are invariably treated as questions of federal rather than state law."); *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 485 (6th Cir. 2001).

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's judgment.